FILED
2023 May-26  AM 11:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## LIN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **LIVE LIFE HEALTHY, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.** _____ |
| | ) | |
| **INSURANCE APPLICATIONS** | ) | **JURY TRIAL DEMANDED** |
| **GROUP, INC. d/b/a ESSENTIAL** | ) | |
| **STAFFCARE; J. MARSHALL** | ) | |
| **DYE,** | ) | |
| | ) | |
| **Defendants.** | | |

## COMPLAINT

Plaintiff Live Life Healthy, LLC d/b/a LLH Healthcare ("LLH") files this Complaint against Defendants Insurance Applications Group, Inc. d/b/a Essential StaffCare ("IAG" or "ESC"), and J. Marshall Dye ("Dye"), stating as follows:

## PARTIES

1.     LLH is a Wyoming limited liability company with its principal place of business at 3000 Galleria Circle, Suite 1500, Birmingham, Alabama, 35244.

2.     LLH's has two members: Edward Shaw and Justin Morganti. Both are citizens of Alabama.

1

3.    Defendant IAG is a South Carolina corporation with its principal place of business at 220 N. Main Street, Suite 605, Greenville, South Carolina, 29601.

4.    Dye is an individual who resides in South Carolina.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, and the dispute is between citizens of different states.

6.    Specifically, LLH—which is a limited liability company—is a citizen of Alabama because its only two members are citizens of Alabama.

7.    IAG—which is a corporation—is a citizen of South Carolina because it is incorporated in South Carolina and has its principal place of business in South Carolina.

8.    Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this litigation occurred within the Northern District of Alabama. Specifically, LLH has suffered injuries in Alabama as a result of actions taken by IAG and Dye that were intended to cause harm in Alabama.

9.    This Court has personal jurisdiction over IAG and Dye.

10.    IAG is registered to do business in Alabama and actively performs business in Alabama.

2

11.    IAG and Dye committed intentional torts that were directly aimed at Alabama and caused a reasonably anticipated injury in Alabama.

12.    Specifically, IAG and Dye interfered with LLH's contractual and business relationships by explicitly telling LLH's clients that LLH's products—which were the subject of the relevant contracts—were illegal tax frauds.

13.    LLH's contracts and prospective contracts have a direct nexus in Alabama because (1) LLH is located in Alabama, (2) LLH has negotiated the relevant contracts from Alabama, (3) LLH has developed prospective business relationships from Alabama, and (4) LLH's standard master services agreement identifies Alabama law as the governing law and Jefferson County, Alabama courts as the exclusive venue.

14.    IAG and Dye knew that LLH was located in Alabama when it intentionally made statements to LLH's clients and prospective clients about LLH's Alabama-based contracts and products.

15.    In fact, IAG and Dye intended to dissuade LLH's clients and prospective clients from doing business with LLH. IAG and Dye's purpose for engaging with these actions was to prevent LLH from continuing or establishing Alabama-based business relationships.

16.    While IAG and Dye's conversations with LLH's clients and existing clients may have occurred outside of Alabama, those conversations were directed

towards Alabama-based contracts and relationships with the intent to interfere with and end those Alabama-based contracts and relationships.

17.    IAG and Dye specifically targeted LLH and its products. LLH's injuries and the effects of IAG and Dye's tortious conduct were not merely incidental consequences of out-of-state conduct. Rather, IAG and Dye intended to harm LLH.

18.    LLH suffered injuries in Alabama because it has lost a significant amount of revenue from existing clients ending contracts with LLH and from prospective clients ending negotiations with LLH.

## FACTUAL ALLEGATIONS

19.    LLH offers a preventative healthcare and chronic disease insurance product, the Hospital Indemnity and Preventative Healthcare Plan ("LLH Plan"). The LLH Plan provides positive financial benefits for employees and employers in accordance with the Affordable Care Act.

20.    The Affordable Care Act allows employers to provide preventative healthcare plans to employees that are paid with pre-tax dollars.

21.    Shortly after passage of the Affordable Care Act, many companies began offering plans to employers that purported to take advantage of this provision and that were "self-funded."

22.     However, most of those plans did not actually offer real insurance products, and the IRS issued an opinion letter in 2017 making clear that these types of "self-funded" plans were not compliant with the Affordable Care Act.

23.     In effect, the IRS ended these types of self-funded plans by clarifying that they were not compliant with the law.

24.     After the IRS issued its opinion letter, LLH began developing a plan that did comply with the Affordable Care Act and the IRS's opinion letter.

25.     LLH spent considerable time and resources developing the Plan and having it vetted by counsel.

26.     As a result of LLH's investment and thorough planning, the LLH Plan is compliant with the Affordable Care Act and IRS guidance, and it offers a legitimate insurance product.

27.     LLH has marketed this plan, and it has signed up several clients for the Plan.

28.     LLH has seen steady growth in its business, and it has continued to receive positive interest in its product.

29.     In early 2023, LLH had several clients who had either signed a contract to offer the LLH Plan to its employees or were strongly interested in doing so.

**Staffing Industry Analysts Convention**

30.    From March 6 to March 9, 2023, Staffing Industry Analysts ("SIA"), a staffing industry membership organization, held a convention in Miami, Florida. The convention gathered senior executives from employers and staffing organizations across several industries.

31.    On March 7, 2023, IAG hosted a session at the convention, and Marshall Dye, the CEO of IAG, gave a presentation to an audience of executives from employer and staffing organizations.

32.    The presentation was titled, "The Return of the 'Double Dip' Tax Fraud Scheme: Understanding Its Key Elements & Dangers."

33.    During the presentation, Dye introduced himself as CEO of IAG and broadly categorized "double dip tax fraud schemes" in such a way that the audience would be led to believe that the LLH Plan is a type of tax fraud. He warned the staffing and employer audience of the dangers of engaging such a plan. Specifically, he claimed that participating in these plans would expose employers and staffing companies to litigation, criminal prosecution, and destruction of their businesses.

34.    In addition, one or more IAG representatives contacted staffing industry associations to inform them that they were going to be speaking specifically about the LLH Plan.

35.    One or more IAG representatives also pressured staffing industry associations to blacklist LLH and inform the members of the associations that

participation in the LLH Plan would result in litigation, criminal prosecution, and destruction of their businesses.

36.    IAG also told members of staffing associations that LLH would be criminally prosecuted for the Plan.

### IAG Communications with LLH Prospective and Existing Clients

37.    Representatives from IAG have communicated with LLH's prospective and existing clients. In those communications, IAG falsely categorized the LLH Plan as a type of tax fraud and warned LLH's prospective and existing clients of legal ramifications for participating in the LLH Plan.

38.    As a result of the foregoing communications, LLH's business relationships have suffered as follows:

a. Company A: Company A was negotiating a contract with LLH to participate in the LLH Plan. After IAG's interference, Company A withdrew from negotiations, resulting in a loss of 4,000 potential employees and 14,000 potential franchise employees on the Plan.

b. Company B: Company B was in the process of reviewing a contract from LLH and had told LLH that it would be signing the contract prior to receiving IAG's communications. After IAG's interference, Company B did not agree to enroll in the LLH Plan, resulting in a loss of 5,000 potential employees on the Plan.

c. Company C: Company C had signed a contract with LLH to participate in the LLH Plan. Its employees had begun onboarding prior to receiving IAG's communications. After IAG's interference, Company C withdrew from the agreement, resulting in a loss of 20,000 employees.

d. Company D: Company D was in the process of reviewing a contract from LLH, and prior to receiving IAG's communications, it told LLH that it would be sign a contract with LLH. After IAG's interference, Company D did not agree to enroll in the LLH Plan, resulting in a loss of 12,000 potential employees on the Plan.

e. Company E: Company E was in the process of reviewing a contract from LLH and had told LLH that it would be signing the contract prior to receiving IAG's communications. After IAG's interference, Company E did not agree to enroll in the LLH Plan, resulting in a loss of 850 potential employees on the Plan.

f. Company F: Company F signed a contract with LLH to participate in the LLH Plan. Approximately six weeks after becoming a client, Company F cancelled their contract with LLH after hearing inaccurate information from IAG. Company F had approximately 400 employees on the LLH Plan.

8

g. Company G: Company G expressed interest in contracting with LLH, and LLH had informed Company how to start the process. Company G then talked with IAG, and IAG told it to steer away from programs like the LLH Plan because it could jeopardize employees with the IRS. Company G has not signed up with LLH.

39.     As a result of IAG's known communications with LLH's clients and potential clients, LLH revenue is millions of dollars lower each month than it otherwise would have been without Defendants' interference.

40.     Upon information and belief, IAG and Dye had made similar statements to other clients or prospective clients of LLH.

41.     LLH will continue to lose revenue and profits because of the loss of these business and contractual relationships.

**American Staffing Association Conference**

42.     IAG/ESC is the largest source of non-dues funding for the American Staffing Association, a staffing industry member organization.

43.     The American Staffing Association is scheduled to hold a conference in October 2023 at which LLH had contracted for exhibit space.

44.     IAG told the American Staffing Association that the LLH Plan was a type of tax fraud.

45.    As a consequence of IAG/ESC's false representations about LLH, the American Staffing Association sent a letter revoking LLH's contract for exhibit space on March 17, 2023—although it later rescinded its revocation letter.

46.    ASA also provided IAG the opportunity to give a webinar talk on May 25, 2023 involving the same content that IAG spoke about at the SIA conference.

## COUNT I—DEFAMATION

47.    LLH incorporates by reference all allegations contained in paragraphs 1 through 46 of this Complaint.

48.    IAG and Dye's statements classifying the LLH Plan as a type of tax fraud are false. The LLH Plan is well-researched and compliant with the Affordable Care Act and IRS guidance.

49.    IAG and Dye's statements concerning the LLH Plan are defamatory in that they lower LLH's reputation in the industry and deter clients and prospective clients by claiming that participation in the LLH Plan will result in legal liability.

50.    IAG and Dye are at fault for making statements that they knew or should have known were false and defamatory.

51.    IAG and Dye's statements were made to conference attendees, members of staffing organizations, LLH's clients, and LLH's prospective clients. The communications were not privileged.

10

52.    As a result of IAG and Dye's defamatory statements, LLH has suffered and continues to suffer damage to the LLH Plan's reputation in the industry and damage to business relationships with clients and potential clients, resulting in financial damages.

LLH therefore requests that this Court enter judgment against Defendants for all damages, including compensatory and punitive damages, interest, attorneys' fees and costs to which LLH is entitled as to be determined by the jury.

## COUNT II—INTENTIONAL INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONS

33.    LLH incorporates by reference all allegations contained in paragraphs 1 through 46 of this Complaint.

34.    LLH had a protectable contractual relationship with Company C and Company F.

35.    LLH had an existing business relationship and potential contractual relationship with Company A, B, Company D, and Company E.

36.    IAG and Dye had knowledge of LLH's actual and potential contracts with Company A, Company B, Company C, Company D, Company E, and Company F.

37.    IAG and Dye were strangers to LLH's actual and potential contracts with Company A, Company B, Company C, Company D, Company E, and Company F.

11

38.    IAG and Dye intentionally and improperly interfered with LLH's actual and potential contracts by falsely communicating to Company A, Company B, Company C, Company D, Company E, and Company F that the LLH Plan is a type of tax fraud that would result in legal liability for its participants.

39.    As a result of IAG and Dye's wrongful conduct, Company C and Company F terminated their contracts with LLH, and Company A, Company B, Company D, and Company E did not move forward with enrolling in the LLH Plan.

LLH therefore requests that this Court enter judgment against Defendants for all damages, including compensatory and punitive damages, interest, attorneys' fees and costs to which LLH is entitled as to be determined by the jury.

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL ISSUES SO TRIABLE.**

This the 25th day of May, 2023.

Sam David Knight  (ASB-1745-N62S)
Christopher B. Driver (ASB-9178-G39B)
sdknight@badhambuck.com
cdriver@badhambuck.com

*Counsel for Plaintiff Live Life Healthy, LLC*

12

OF COUNSEL:
BADHAM & BUCK, LLC
2001 Park Place North, Ste. 500
Birmingham, Alabama 35203
Phone: (205) 521-0036
Facsimile: (205) 521-0037

**PLAINTIFF WILL SERVE DEFENDANTS AT THE FOLLOWING ADDRESSES AS INDICATED BELOW:**

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
Insurance Applications Group, Inc.
d/b/a Essential StaffCARE
c/o National Registered Agents, Inc., Registered Agent
2 North Jackson Street, Suite 605
Montgomery, AL  36104

**VIA SPECIAL PROCESS SERVER:**
J. Marshall Dye
220 N Main St. STE 605
Greenville, SC 29601